[L. A. No. 2730.   Department One.—December 20, 1911.]

SEAL OF GOLD MINING COMPANY (a Corporation), Appellant, v. H. B. SLATER, F. M. SABATHE, and R. B. SHELDON, Respondents.

CORPORATIONS — SPECIAL MEETING OF DIRECTORS — PLACE — HALL AT LOCKED OFFICE—SUBSTANTIAL COMPLIANCE WITH CODE.—Where the office of the directors of a corporation was the regular office of its president, who had left the door locked at a time when a special meeting of the directors had been regularly called, their convening in the hall just outside the office was a substantial compliance with section 319 of the Civil Code, requiring that their meetings "must be held *at* its office or principal place of business." No other director

could have been thereby deprived of an opportunity to attend the meeting had he desired to do so.

ID.—REASONABLE CONSTRUCTION OF STATUTE—INABILITY OF POSSESSOR OF OFFICE TO PREVENT MEETINGS.—Under any reasonable construction of the statute, it cannot be held that any person who happens to be in possession of the office of the corporation has power, by excluding its directors and members, to absolutely prevent the holding of meetings.

ID.—QUORUM OF DIRECTORS—INCLUSION OF DIRECTOR AFTER RESIGNATION UNACCEPTED.—A director who had tendered his resignation to the board, which by its terms was "to take effect upon acceptance," and which had not been accepted at the time of the special meeting, had the right to attend the same, at the request of other directors, and thereby complete a quorum of directors with power to adjourn such meeting to a stated time.

ID.—FRAUD NOT APPEARING IN SPECIAL MEETING.—The mere circumstance that such director who had tendered his resignation had stated that he would not attend, and that another director, upon being informed that he would not attend, believed that there would be no quorum, cannot make it a fraud upon the corporation for a majority of the board, including the director who had said he would be absent, to meet and act pursuant to proper call and notice.

ID.—POWER OF QUORUM AT ADJOURNED SPECIAL MEETING—BY-LAWS— NEW NOTICE NOT REQUIRED — PRESUMED KNOWLEDGE — SCOPE OF BUSINESS.—Where the by-laws give to a quorum of directors power to adjourn a meeting within certain limits, and the special meeting was properly adjourned, and the by-laws also provide that "all acts and proceedings regularly had and done at meetings regularly adjourned from meetings called or held, shall be valid and binding as if had and done at meetings otherwise regularly called and held," no new notice is required thereunder to absent directors of such adjourned meeting who had notice of the original special meeting; but they are bound to know that the special meeting might be adjourned and that such business might be transacted at the adjourned meeting which could have been transacted at the original meeting.

ID.—PROPER ACTION OF DIRECTORS AT ADJOURNED MEETING—ACCEPTING DIRECTOR'S RESIGNATION — REMOVING PRESIDENT — CHOOSING SUCCESSORS—REMOVAL OF OFFICE.—The quorum of directors present at the adjourned special meeting had the same power which it had at the original special meeting to accept the resignation of director and elect his successor, to remove its president, who had locked the office against them, and to choose another president, and to remove the office to another place in the same city.

ID.—NATURE AND EFFECT OF NOTICE OF SPECIAL MEETING—JURISDICTION TO ACT WITHIN SCOPE OF POWERS.—The notice of a special meeting of a board of directors of a corporation under the laws of this state is not required to specify the purpose of the meeting, but all that

is required, under section 320 of the Civil Code, is a written notice sufficient to inform the directors that a special meeting of the directors is called, and of the exact time and place where it is to be held, and where the notice contained these requirements, it was effective to confer upon the board jurisdiction to transact business properly within the scope of its powers at the time of the meeting.

ID.—POWER OF REMOVAL OF OFFICE—DISCRETION OF DIRECTORS—CONSTRUCTION OF CODE.—The location and removal of the office of the corporation was a matter committed to the discretion of the directors. Even if the "office" of a corporation be treated as equivalent to its "principal place of business," the requirements under section 321a of the Civil Code, forbidding the principal place of business to be changed except with the consent of the holders of two thirds of the stock, and upon publication of a notice of the intended change, do not, by its terms, apply to a removal from one location to another in the same city.

ID.—SUFFICIENT NOTICE OF REMOVAL—NOTICE TO ALL DIRECTORS.—It was a sufficient notice of such removal that notice of the change of the company's office in the same city had been given to all of its directors shortly after such change had been ordered, so that they would have notice of the place where the regular meetings of the directors would thereafter be held.

ID.—EFFECT OF TRANSFER OF STOCK BY DIRECTORS—CONTINUANCE TO ACT—DE FACTO DIRECTORS—ACTS VALID AS TO THIRD PARTIES.— Whatever may be the rule in other states as to the complete divestiture of the office of a director when he transfers his stock, the settled rule in this state is that, if he continues to act as a director, notwithstanding such transfer, he is a *de facto* director whose acts are valid as to third persons dealing with the corporation, and his title to the office cannot be impeached collaterally.

ID.—VALIDITY OF LEASE OF PART OF CORPORATION'S MINING CLAIMS AT REGULAR MEETING.—The directors of the corporation had power, at its regular meeting, to authorize the lease of part of its mining claims to one of the defendants for the period of five years, in consideration of his agreement to work the same and to pay to the corporation a certain percentage of its net proceeds. Such a lease, not covering the whole of plaintiff's property, is not affected by the terms of section 361a of the Civil Code.

ID.—CONSTRUCTION OF BY-LAWS RESTRICTING "CONVEYANCE."—The by-laws of the corporation, providing that "no mortgage or conveyance shall be made without the consent of the holders of at least two thirds of the outstanding capital stock of the corporation," are to be construed as using the word "conveyance" in the more restricted sense as importing an act whereby the legal or equitable title to real property of the corporation is transferred, and not as applying to a mere authorized lease of part of its property that would not lead to any change of ownership. In its ordinary significance, without re-

ferring to registry acts, the term "conveyance" does not include leases of terms for years.

APPEAL from a judgment of the Superior Court of San Bernardino County and from an order denying a new trial. Benjamin F. Bledsoe, Judge.

The facts are stated in the opinion of the court.

M. E. C. Munday, Charles S. McKelvey, Curtis & McNab, Ward Chapman, and McNutt, McNutt & Hannon, for Appellant.

Purrington & Adair, for Respondent.

SLOSS, J.—The plaintiff, claiming to be the owner and entitled to the possession of certain mining claims in San Bernardino County, brought this action, alleging in its complaint that the defendants had entered into the possession of said premises, ousting plaintiff therefrom, had destroyed buildings on said properties, and extracted gold-bearing ores therefrom. It was alleged that the defendants were still in possession and would, unless restrained, continue to extract ore, and would destroy the value of the property. The prayer of the complaint was for damages and for a temporary injunction restraining waste.

The defendant Slater answered, averring that neither of his co-defendants claimed any interest in the property. For himself he admitted plaintiff's ownership of the property, but asserted that he was in possession and entitled to possession by virtue of a lease of the mining claims, made by the plaintiff corporation to him. The destruction of buildings was denied, and the taking of ore was justified under the lease.

The findings of the court were in support of the allegations and denials of the answer, and judgment in favor of defendants followed. The plaintiff appeals from the judgment and from an order denying its motion for a new trial.

The one question in the case is whether the lease, which was the sole foundation for Slater's claim of a right to enter and work the property, was valid and binding upon the plaintiff.

The Seal of Gold Mining Company was a California corporation. It had a board of seven directors. Prior to Sep-

tember 18, 1908, H. A. Landwehr was president of the corporation and one of its directors, and the other directors were George H. Moore, Edgar Sharp, C. F. Huse, Alex Strachan, A. N. Younglove, and P. T. Evans. The office of the corporation was room 306 of the Douglas Building, in the city of Los Angeles.

A special meeting of the board of directors was regularly called for the eighteenth day of September, 1908. At the time set four of the above-named persons—to wit, Sharp, Strachan, Younglove, and Evans—came to the Douglas Building, but were unable to obtain access to room 306, the office of the corporation, the door to said room, which was also the office of Landwehr, being locked. They convened as a board in the hall of the building, "just outside of the office of the company," and adjourned the meeting to the twenty-first day of September, 1908, at eleven o'clock A. M. The same four met at the office of the company, at the time to which the meeting of the 18th had been adjourned, and after accepting the resignation of George H. Moore as director elected W. L. Peters to succeed him. Peters, who was present, at once took his seat as director. A resolution was then adopted removing Landwehr from the office of president and electing Strachan in his place. A further resolution, moving the office of the company to room 459 of the Pacific Electric Building, was adopted.

The by-laws of the corporation provided for a regular meeting of the board of directors, without notice, on the tenth of each month, at noon. On October 10th, at noon, Younglove, Evans, Strachan, and Peters met as a board of directors at room 459 of the Pacific Electric Building and adopted a resolution authorizing the president and secretary to execute and deliver to Slater the lease under which he claims, and the instrument was accordingly executed.

The various objections to this transaction urged by appellant are based in part on the facts stated above, and in part on further facts that will be set forth in discussing the particular points upon which they bear.

While the lease in question was authorized at the regular meeting of October 10th, the validity of the acts done on that occasion depends upon the regularity of the two prior meetings. The meeting of October 10th was participated in by a director elected at, and was held at a place fixed by, the meet-

ing of September 21st, which was itself an adjournment of the meeting of September 18th.

1. The validity of the meeting of September 18th is assailed on the ground that the directors did not meet at the office of the corporation. Section 319 of the Civil Code provides that "the meetings of the stockholders and board of directors must be held at its office or principal place of business." We need not inquire what is meant by the phrase "principal place of business" in this section. Apparently it is not used in a sense synonymous with that of "office." Its precise significance is unimportant here, for the reason that the notice of the meeting in question specified the office of the company as the place of meeting. Doubtless, therefore, the board was required to convene at such office. We think, however, that the facts above set forth show a substantial compliance with the requirement that the meeting be held at the office of the corporation. A majority of the directors, attempting to assemble pursuant to a regular notice, found the door of the office locked. They convened in the hall, outside of the door. No other director could have been thereby deprived of the opportunity to attend had he desired to do so. The place was in immediate proximity to the office, and was the only place available under the circumstances. The provision relied upon is that the meeting must be held "at," not "in" the office. It cannot be, under any reasonable construction of the statute, that any person who happens to be in possession of the office of the corporation has the power, by excluding the directors and members, to absolutely prevent the holding of meetings.

2. It is claimed that Sharp, who participated in the meeting of September 18th, and whose presence was necessary to constitute a quorum, had resigned, and so ceased to be a director. He had, in a writing addressed to the board, tendered his resignation, but the resignation was, by the terms of the writing, "to take effect upon acceptance;" and there was evidence sufficient to warrant the trial court in believing that it was not accepted until the 21st day of September.

3. We see no force in the contention that it was a fraud upon the corporation to hold the meeting of September 18th. The facts relied upon in this regard are that Sharp, after informing Landwehr that he would not go to the meeting, did nevertheless, at the request of other directors, attend and

participate. But the meeting had been regularly called, and all of the directors had had notice. The mere circumstance that one of them was told that another would not attend, and believed that a quorum would not be present, is not enough to make it a fraud for a majority of the board, including the director who had stated that he would be absent, to meet pursuant to proper call and notice.

4. The meeting of September 18, 1908, transacted no business other than the taking of an adjournment to September 21st. Under the by-laws, a quorum had power to adjourn a meeting from time to time, not exceeding a period beyond the next regular meeting. The by-laws further provided that "all acts and proceedings regularly had and done at meetings regularly adjourned from meetings called or held, shall be valid and binding as if had and done at meetings otherwise regularly called and held." No notice of the adjournment was given to the directors who had not been present on September 18th. But, under the provision of the by-laws just quoted, no such notice was required. A director receiving notice of a meeting was bound to know that a quorum might adjourn, and that business might be transacted at the adjourned meeting. And this is in accordance with the general rule, which is that no notice of adjournment of a meeting regularly called need be given. (3 Clark & Marsh. on Corporations, secs. 649, 680; *Smith* v. *Law*, 21 N. Y. 296; *Western I. Co.* v. *Des Moines Nat. Bank*, 103 Iowa 455, [72 N. W. 657].) *Thompson* v. *Williams*, 76 Cal. 153, [9 Am. St. Rep. 187, 18 Pac. 153], has been cited (see 10 Cyc., 786; 3 Thompson on Corporations, sec. 3937) as authority for the contrary doctrine, but that case went off on the ground that the hour to which the adjournment was taken was not fixed at the original meeting, and that a new notice was therefore required.

The board, at the meeting of September 21st, had power, therefore, to transact any business which they might have transacted at the meeting of September 18th. There is nothing to the contrary decided in *Bank of National City* v. *Johnston*, 133 Cal. 185, [65 Pac. 383], cited by appellant. In that case a resolution adopted at an adjourned meeting was held invalid for the reason that it was one that the directors could not lawfully have passed at the original meeting.

5. Of the things done at the meeting of September 21st,

the only ones having any bearing on the present controversy are the acceptance of the resignation of Moore as director, the election of Peters in his place, and the removal of the office of the corporation to room 459 of the Pacific Electric building. Could the resolutions seeking the accomplishment of these purposes have been adopted at the first meeting, that of September 18th? It is argued that they could not, because they were not specified in the notice which was given to the directors prior to such meeting. But it appears to be settled in this state that a notice of a special meeting of the board of directors need not specify the purpose of the meeting. (*Granger* v. *Orig. Emp. M. & M. Co.*, 59 Cal. 678; *Bell* v. *Standard Q. Co.*, 146 Cal. 699, 705, [81 Pac. 17].) All that is required by the statute (Civ. Code, sec. 320) is a "written notice sufficient to inform the directors that a special meeting of the directors is called, and of the exact time and place where it is to be held." (See cases last cited.) The notice here given contained all these requirements, and it was, therefore, effective to confer upon the board jurisdiction to transact any business properly within the scope of its powers at the time of the meeting. It cannot be questioned that the board had power to accept the resignation of a director, and to elect his successor. (Civ. Code, sec. 305.) And the location and removal of the office of the corporation was equally a matter committed to the discretion of the directors. Under section 321a of the Civil Code, the principal place of business of a corporation can be changed only with the consent of the holders of two thirds of the stock, and upon publication of a notice of the intended change. But, even if the "office" be treated as equivalent to the "principal place of business," these requirements of consent, notice, and publication do not, by the express terms of the section, apply to a removal from one location to another in the same city.

6. On the morning of September 18th, before the meeting of that day, Sharp endorsed in blank and delivered to Landwehr the certificate representing all the stock owned by him. On the nineteenth the stock was transferred on the books of the corporation to a person designated by Landwehr. It is claimed that, inasmuch as the directors must be "elected from among the holders of stock" (Civ. Code, sec. 305) Sharp, upon the transfer of his shares on September 19th at once ceased to

be a director, and so could not participate in the meeting of September 21st. His participation was necessary to constitute a quorum at that meeting, and the contention is that the election of Peters as successor to Moore, and the subsequent removal of the office, were void.

There seems to be abundant authority in other jurisdictions to the effect that where the charter or a statute requires a director to be a stockholder, a director who parts with all his shares *ipso facto* divests himself of his title to his office. (3 Clark & Marsh. on Private Corporations, sec. 661; 3 Cook on Corporations, sec. 623, and cases cited.) But at least in this state, it is thoroughly settled that if the director continues to act as such, notwithstanding the transfer of his stock, his acts are valid as to third persons dealing with the corporation, and his title to office cannot be impeached collaterally. (*San Jose Sav. Bank* v. *Sierra L. Co.*, 63 Cal. 181; *Robinson* v. *Blood,* 151 Cal. 504, [91 Pac. 258]; *Sherwood* v. *Wallin,* 154 Cal. 735, 742, [99 Pac. 191].) Speaking of a director whose position was similar to that of Sharp here, the court said, in *San Jose Sav. Bank* v. *Sierra L. Co.*, 63 Cal. 181: "Until he was ousted on a direct proceeding he was a director *de facto,* and his acts as director would be valid as to third persons. This, in our judgment, is settled beyond controversy. To hold otherwise would be to render insecure all the operations of corporations."

7. If the foregoing views be sound, the objections to the meeting of October 10th fall to the ground. The persons participating were three of the old directors, together with Peters, whose election, as we have seen, was regular and proper. There was evidence that notice of the meeting was given. But if it had not been, there was no necessity for notifying the absent directors of the time of meeting, as the time was prescribed by the by-laws. Notice of the change of the company's office to the Pacific Electric building had been given to all of the directors shortly after such change had been ordered, so that each director in fact had notice, through the by-laws, that a meeting would be held on October 10th, and had been advised of the place where the meeting would be held.

8. The final argument against the validity of the lease is based on the following provision of plaintiff's by-laws: "No mortgage or conveyance shall be made without the consent of

the holders of at least two thirds of the outstanding capital stock of the corporation." There was no such consent to the making of the lease here in question.

The instrument in question was in form a lease, whereby the plaintiff let to Slater certain mining claims for the term of five years, in consideration of Slater's agreement to work the claims and to pay the plaintiff a certain percentage of the net proceeds. (It did not cover the whole of plaintiff's property, and there is no question, therefore, of the application of section 361a of the Civil Code.) Such a lease is not, of course, a mortgage. Is it a "'conveyance," within the meaning of the by-law? "The term conveyed, or conveyance, is used in several senses. In the strict legal sense the latter term imports a transfer of legal title to land; but it is also habitually used by lawyers to denote any transfer of title, legal, or equitable; and the last is also the popular sense of the term." (*Adams* v. *Hopkins,* 144 Cal. 19, 37, [77 Pac. 712].) Not being a word exclusively technical, it is not necessarily to be given a technical sense, unless shown to have been used in that sense. (Id.; Civ. Code, sec. 1645.) The meaning is to be ascertained from the context. The accompanying language may, to be sure, be such as to show that leases are included in the term "conveyances." For example, the sections of the Civil Code (1213, 1214, 1215), dealing with the recording of "conveyances" of real property, define the term in such manner as clearly to embrace within it leases for a term exceeding one year. (See *Odd Fellows' Sav. Bank* v. *Banton,* 46 Cal. 603, 607; *Jones* v. *Marks,* 47 Cal. 243.) But the definition contained in section 1215 is limited to the term conveyance "as used" in the sections just preceding. (*Stewart* v. *Powers,* 98 Cal. 514, 518, [33 Pac. 486].) It does not purport to fix the meaning of the word when employed in different statutes or in contracts or other instruments executed by private parties. Thus, it has been held that a lease is not a conveyance within the meaning of a statute authorizing an appeal from a probate order against or in favor of directing the conveyance of real property (*In re Tuohy's Estate,* 23 Mont. 305, [58 Pac. 722]) or of a statute providing that a married woman cannot incumber or convey her lands except by deed in which her husband shall join (*Heal* v. *Niagara Oil Co.,* 150 Ind. 483, [50 N. E. 482]) or of one providing that no covenant shall be

implied in any conveyance of real estate (*City of New York v. Mabie,* 13 N. Y. 151, [64 Am. Dec. 588].) While the term "conveyance" has often been defined in such manner as to include leases of terms for years (see *Chandler* v. *Hart, ante,* p. 405, [119 Pac. 516]), it is generally held that, in its ordinary significance, the term does not include such leases. (7 Am. & Eng. Ency. of Law, 2d ed., 487; *Des Moines C. A. Soc.* v. *Tubbessing,* 87 Iowa, 138, [54 N. W. 68]; *Perkins* v. *Morse,* 78 Me. 17, [57 Am. Rep. 780, 2 Atl. 130]; *Sullivan* v. *Barry,* 46 N. J. L. 1, 5; *Edwards* v. *Perkins,* 7 Or. 149.)

In construing the by-laws above quoted, we think the word "conveyance" should be read in its more restricted sense, as importing an act whereby the legal or equitable title to real property is transferred. Not only is this in accord with the usual understanding of the term, but it gives to the by-law a more reasonable operation and effect. The purpose of the provision probably was to protect the stockholders against the loss of the corporate property by improvident acts of the directors. Such loss might result either from an executed or executory sale, or from the making of a mortgage with its necessary incident of the possibility of forced sale on foreclosure. But it is not to be supposed that the stockholders, in framing their by-laws, were seeking to take control of the corporate property from the directors to such an extent as to hamper the board in dealing effectively with the property in ways that would not lead to a parting with the ownership.

In addition to their contention that the lease is not within the terms of the by-law, the respondents make the points that the by-law is not binding upon Slater, who does not appear to have had notice of its restrictions, and that the by-law is void as being in conflict with the law (Civ. Code, secs. 305, 308) vesting the exercise, conduct, and control of the corporate powers, business, and property in the board of directors. A consideration of these points is rendered unnecessary by the construction we have given to the attempted limitation upon the powers of the board.

The judgment and order appealed from are affirmed.

Angellotti, J., and Shaw, J., concurred.